**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NIKKI DRIY, individually, and<br>CAMERON WRIGHT, individually,<br><br>Plaintiffs,<br><br>v.<br><br>PATTONVILLE HIGH SCHOOL,<br>PATTONVILLE SCHOOL DISTRICT, et al.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 4:25-cv-00536-MAL |

**DEFENDANTS' STATEMENT OF UNCONTROVERTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

COME NOW Defendants Pattonville High School, Pattonville School District ("the District"), Teisha Ashford, Barry Nelson, Tim Pecoraro, Jon Fitzgerald, Gene Grimshaw, Andre Redden, Mary Kay Campbell, Lisa Kickbusch, Brian Gray, Jan Schweiss and Rená Simmons (hereinafter collectively "the Defendants"), by and through their attorneys, TUETH KEENEY COOPER MOHAN & JACKSTADT, P.C, and pursuant to pursuant to Local Rule 4.01(E), hereby submit their Statement of Uncontroverted Material Facts in Support of their Motion for Summary Judgment:

## I. BACKGROUND

1. Pattonville School District ("the District") is a public school district operating pursuant to the laws of the State of Missouri. *See* Affidavit of Dr. Barry Nelson ("Nelson Affidavit"), at ¶ 3, attached hereto as Exhibit 1.

2. The District is governed by a seven-member board of education ("Board of Education"). *See* Ex. 1, Nelson Affidavit, ¶ 4.

3. Pattonville High School ("the School") is a public high school operated by Pattonville School District. *See* Ex. 1, Nelson Affidavit, ¶ 5.

4. Dr. Barry Nelson ("Dr. Nelson") has been employed by the District as its Superintendent of Schools since August 2022. *See* Ex. 1, Nelson Affidavit, ¶ 2.

5. As Superintendent, Dr. Nelson is responsible for the general supervision, subject to the policies established by the District's Board of Education, of all of the District's schools, staff members, and students. *See* Ex. 1, Nelson Affidavit, ¶ 6.

## II. APPLICABLE DISTRICT POLICY

6. At all relevant times herein, the District's Board of Education vested Dr. Nelson, as the District's Superintendent of Schools, with the authority to suspend a student for up to 180 school days, through its Policy JGD, titled Student Suspension and Expulsion. *See* Ex. 1, Nelson Affidavit, ¶¶ 7, 17; *see also*, Board Policy JGD, Student Suspension and Expulsion ("Policy JGD"), attached hereto as Exhibit 2.

7. District Policy JG, titled Student Discipline, states that the Board "authorizes the immediate removal of a student upon a finding by a principal or superintendent that the student poses a threat of harm to self or others" and "any such removal will be subject to the appropriate due process procedures and in accordance with law." *See* Ex. 1, Nelson Affidavit, ¶¶ 8, 17; *see also*, Board Policy JG, Student Discipline ("Policy JG"), attached hereto as Exhibit 3.

## III. CAMERON'S DISCIPLINE

8. Plaintiff Cameron Wright ("Cameron") is a former student of Pattonville High School ("School"), who was a sophomore in the Spring of 2023. *See* Deposition Transcript of Plaintiff Cameron Wright ("Wright Depo"), 16:2-4, attached hereto as Exhibit 4 ("Q: Did you attend for all four years of high school, were you at Pattonville? A: Yes."); 9:22-23 ("Q: And

what is your highest level of education? A: I'm a high school graduate. Q: When did you graduate? A: 2025."); *see also* Ex. 1, Nelson Affidavit, ¶ 9.

9. On the morning of March 6, 2023, at approximately 8:00 a.m., Pattonville High School administrators became aware of a message written on the wall of a bathroom stall in the H-wing of the first floor in the boys' restroom, written lightly in pencil, stating "I'm gonna shoot the school up on Monday." *See* Affidavit of Assistant Principal Jared Beucke ("Beucke Affidavit"), at ¶ 3, attached hereto as Exhibit 5; *see also* Discipline Hearing Packet ("Discipline Packet"), PSD000010-000048 at PSD000035, attached hereto as Exhibit 6.

10. Due to the concerning and violent nature of the message, and in hopes of preventing yet another school shooting in our country, the School's administrators immediately began investigating the situation. *See* Ex. 5, Beucke Affidavit, ¶ 4.

11. About 30 minutes after the first message was found, another message was found written in pencil in the D-wing first floor boys' restroom with similar wording and handwriting. *See* Ex. 5, Beucke Affidavit, ¶ 5; *see also* Ex. 6, Discipline Packet at PSD000036.

12. Due to the location, the wording, and the handwriting of both messages, the School's administrators determined that the message must have been written by the same individual. *See* Ex. 5, Beucke Affidavit, ¶ 6.

13. As a result, students were put into a Level 1 lockdown and then sent home from school early on March 6, 2023, mid-day, for their safety. *See* Ex. 5, Beucke Affidavit, ¶ 7.

14. After students went home, District administrators observed video footage and the only student who was seen going into both restrooms in the relevant suspected time frame was then-sophomore student, Cameron. *See* Ex. 5, Beucke Affidavit, ¶ 8.

15. Cameron's history teacher, Mr. David Gross, provided a sample of Cameron's handwriting from Cameron's previous schoolwork. *See* Ex. 5, Beucke Affidavit, ¶ 9; *see also* Ex. 6, Discipline Packet at PSD000039-000043.

16. Mr. Gross also provided a statement, wherein he reported that Cameron was agitated and constantly on his phone during the lockdown on the day the threats were found at the School, despite being redirected multiple times. In his statement, Mr. Gross reported that this behavior was out of-character for Cameron. *See* Ex. 5, Beucke Affidavit, ¶ 10; *see also* Ex. 6, Discipline Packet, at PSD000033.

17. An officer from the Maryland Heights Police Department reported to Mr. Beucke that he reviewed the written threats, video footage, and Cameron's handwriting samples, and determined Cameron's writing was consistent with the threats written on the walls of the School's bathrooms. *See* Ex. 5, Beucke Affidavit, ¶ 11.

18. School administrators agreed with the Maryland Heights Police Department and determined that Cameron's handwriting sample was consistent with the threats written on the walls of the two School bathrooms. *See* Ex. 5, Beucke Affidavit, ¶ 12.

19. The Maryland Heights Police Department arrested Cameron later that afternoon of March 6, 2023. *See* Deposition Transcript of Plaintiff Nikki Driy ("Driy Depo"), 19:8-18, attached hereto as Exhibit 7 ("Q: So, Cameron was arrested by the police March 6th, right? A: Yes. Q: And that's the same day that those threats were found in the school? A: Yes, it was only, from the time he got home to the time they showed up, a couple hours. Q: Got it. And the police, you – to your understanding, the police thought they had probable cause to arrest Cameron, right? A: I would assume, so.").

20. Shortly thereafter, the District was notified that Cameron had been arrested and criminally charged with Terrorism (F) – Making a Terroristic Threat. *See* Ex. 5, Beucke Affidavit, ¶ 13.

21. While in police custody, Cameron learned that he was suspected of writing the threats on the School's bathroom walls, that there was video footage of him going into both bathrooms where the threats were found, and that his handwriting was believed to match the threats written on the bathroom walls. *See* Ex. 4, Wright Depo, 37:18-38:7 ("Q: So, you were then arrested by the police on March 6th of 2023; is that correct? A: Yeah. Q: And that's the same day that those threats were found on the bathroom wall, right? A: Yes. Q: And the police believed that they had a reason to arrest you, correct? A: Yes. Q: When you were arrested, did the police officers tell you that the district had a video of you going into both of the bathrooms that had the threat? A: Yeah, they were – yeah, the cop was telling me that on the way to the police department."), 39:9-12 ("Q: … did the police tell you that they thought that the handwriting on the wall matched your handwriting? A: Yes, they did say.").

22. When arresting Cameron, Maryland Heights Police told Ms. Driy that they believed his handwriting matched the threats on the School's bathroom walls. *See* Ex. 7, Driy Depo, 19:19-20:4 ("Q: When Cameron was arrested, a police officer told you that the district had video of Cameron going into both bathrooms, right? A: No, I was not aware at that time. They said that they – after I, you know, assumed it was for that, I asked to see the handwriting – or, they said that they compared, they analyzed it or compared it and the handwriting matched is what they kept saying. Q: Got it. When were they saying that to you? A: In the house before he left.").

23. By the evening of March 6, 2023, Plaintiffs knew that Cameron was suspected of writing the threats on the bathroom walls of the School. *See* Ex. 4, Wright Depo, 39:17-20 ("Q: So, you knew on March 6th that you were suspected of writing the threats on the bathroom walls, correct? A: Once I was arrested, yes."); 40:6-9 ("Q: But you knew on March 6th that the district thought that you had written those threats that were on the wall that day? A: Yes"); Ex. 7, Driy Depo, 20:5-9 ("Q: Okay. So, you knew that day that, on March 6th, that Cameron was suspected of writing the threats on the bathroom walls of school, right? A: I assumed by the conversation with the police when they showed up at my door.").

24. On the evening of March 6, 2023, Mr. Beucke called Ms. Driy and arranged for her to bring Cameron to the school on March 7, 2023, to discuss the allegations and his involvement with the threats. *See* Ex. 5, Beucke Affidavit, ¶ 14.

25. Ms. Driy texted Mr. Beucke the evening of March 7, 2023, saying she did not believe Cameron was responsible for the threats, and stating, "I checked his backpack when they arrested him, nothing but pencils." *See* Ex. 5, Beucke Affidavit, ¶ 15.

26. On March 7, 2023, Mr. Beucke continued his investigation, during which he obtained statements from ten (10) other District students. *See* Ex. 5, Beucke Affidavit, ¶ 19.

27. In addition, on March 7, 2023, Mr. Beucke interviewed a student who submitted a Quicktip alert to the school. *See* Ex. 5, Beucke Affidavit, ¶ 20.

28. The student who submitted the Quicktip provided SnapChat messages between Cameron and other District students. *See* Ex. 5, Beucke Affidavit, ¶ 20; *see also* Ex. 6, Discipline Packet, at PSD000037-000038.

29. In the SnapChat messages, Cameron stated, "Aye there abt to be hella cops at school nd they might take y'all in to ask questions so if y'all bring shi tmr don't get caught." He

also posted, "They got my laptop too wit all my messages" and "Nd don't say shi I'm so fr". In response, another student stated on SnapChat, "onm everyone js act clueless asf" and "don't say no names or anything". Then another student posted, "Ong deni deni deni every thing the ask". *See* Ex. 5, Beucke Affidavit, ¶ 21; *see also* Ex. 6, Discipline Packet, at PSD000037-000038.

30. Plaintiffs, Ms. Driy's husband, and their lawyer met with the District the next day, March 7, 2023. *See* Ex. 4, Wright Depo, 41:3-12 ("Q: Did you meet with the district on March 7th with your mom? A: Would that have been at the high school? Q: Yes. A: We – so, yeah, we did meet with them at the high school … Q: Who else went with you? A: It was my mom was with me, my lawyer, and I believe my step dad was."); Ex. 7, Driy Depo, 22:5-10 ("Q: So you said you went to the school on the 7th, it'd be the next day the 7th – A: Uh-huh. Q: - with your husband and a lawyer and Cameron? A: Cameron, uh-huh.").

31. Due to the presence of legal counsel, Mr. Beucke explained he could not discuss the investigation without also having the District's legal counsel present. *See* Ex. 5, Beucke Affidavit, ¶ 16.

32. That said, Mr. Beucke provided Cameron with an opportunity to provide a written statement to explain his response to the allegations. *See* Ex. 5, Beucke Affidavit, ¶ 17; *see also* Ex. 4, Wright Depo, 41:13-22 ("Q: And during that meeting, you were given a piece of paper and asked to provide a statement; is that right? A: Yeah.).

33. Cameron provided a statement to Mr. Beucke via email on March 8, 2023, at 7:01 a.m., denying being the individual who wrote the message on the bathroom stall and stating that he had only been in the bathroom to blow his nose. *See* Ex. 5, Beucke Affidavit, ¶ 18; *see also* Ex. 4, Wright Depo, 41:13-22 (Q: And you did provide a statement to the district, right? A: Yes, but not that – not that – at the school. I went home and I did it. Q: you typed it? A: Yeah."), 43:3-

9 ("Q: … this is a true and accurate copy of the statement that you provided, correct? A: A true inaccurate? Q: And accurate. Like, this is the statement that you provided to the district? A: Okay, yeah. Q: Yeah."); Ex. 7, Driy Depo, 22:16-23 ("Q: During that meeting, Cameron was given a piece of paper and asked to provide a statement, right? A: Yes. Q: And did you provide a statement to the district? A: Yes. I can't remember if he wrote it right then or later and we sent it, but, yes."); *see also* Ex. 6, Discipline Packet, at PSD000022.

34. Following his investigation of the incident and after reviewing Cameron's statement, Mr. Beucke determined that, based on a preponderance of the evidence, Cameron was responsible for writing the threats on the two bathroom walls, and he suspended Cameron for ten (10) days with a referral to a disciplinary hearing to determine if he should receive additional days of suspension for the offense of Level III, 13: Threats to Bring Weapons or Harm to Individuals or School Property. *See* Ex. 5, Beucke Affidavit, ¶ 22.

35. Plaintiffs were notified on or about March 8th, 2023, that Cameron would be suspended from March 8th through March 29th. *See* Ex. 4, Wright Depo, 45:21-46:22 ("Q: So, you were notified that you had been suspended from March 8th through March 29th, correct? A: Honestly, I don't remember – I remember the suspension starting later than that, but I could be wrong. Q: Later than the 8th? A: But if it says right here then I probably did. Q: Got it. You don't remember exactly, but you're assuming whatever the letter says – A: Yeah. Q: - is correct. And so, according to this letter and your memory, if you can remember, you could return to school on March 30th, 2023 unless the district decided to extend your suspension, right? A: Yes. Q: So, this notification, like, this letter, came after you already knew that the district suspected that you wrote these threats on the bathroom walls? A: Yes. Q: And it came after you provided a statement to the district with your response, right? Which is the statement we just talked about? A: Yeah,

I'm pretty sure."); Ex. 7, Driy Depo, 25:9-13 ("Q: So you were notified on March 8th that Cameron was suspended for ten days, right? A: Was that a – was that the Wednesday? Q: Yeah. Yeah. A: I believe it was March 8th."), 25:20-23 ("Q: And you were told that this suspension would start March 8th and would go through the 29th? A: I believe so."), 26:12-23 ("Q: So this notification, this letter here, was after you knew that the district suspended – A: Oh, it says it here, yeah. Q: Yeah. This was after you knew that the district suspected Cameron of writing threats on bathroom walls, right? A: Correct. Q: And it came after he provided the statement on March 7th to the district with his response to the allegations, right? A: Correct."); *see also* Ex. 6, Discipline Packet, at PSD000022.

36. On or about March 9, 2023, Principal Teisha Ashford notified Ms. Driy by letter that she recommended to Dr. Nelson that Cameron be suspended for 180 days for Level III, 13: Threats to Bring Weapons or Harm to Individuals or School Property. *See* Ex. 5, Beucke Affidavit, ¶ 23; *see also* Ex. 6, Discipline Packet, at PSD000007.

37. On or about March 10, 2023, Mr. Beucke sent a letter to Ms. Driy, informing her that Cameron had been suspended for ten (10) days, that the suspension may be extended by Dr. Nelson, and enclosed a copy of the School's discipline policy. *See* Ex. 5, Beucke Affidavit, ¶ 24; Ex. 1, Nelson Affidavit, ¶ 10; *see also* Ex. 6, Discipline Packet, at PSD000017.

38. On or around March 10, 2023, Plaintiffs were notified in a letter from Dr. Nelson that Cameron's suspension may be extended for a period of up to 180 days, or expulsion, to be determined at a hearing. *See* Ex. 7, Driy Depo, 28:14-29:9 ("Q: So on March 10th, you were notified in this letter that Dr. Nelson may extend Cameron's ten day suspension for a period of up to 180 days or expulsion, would be determined at a hearing, right? A: Correct. Q: And this letter states that the suspension may be extended, right? A: Correct. Q: And that the determination

would be made after a hearing? A: Correct. Q: So this letter also notified you that the hearing would be conducted on March 27th, right? A: Yes. Q: And it also told you that copies of relevant statements would be provided to you on request, right? A: Yes. Q: And indicated that you could have legal counsel, right? A: Yes."); *see also* 1, Nelson Affidavit, ¶ 11; Ex. 6, Discipline Packet at PSD000013-000014.

39. Dr. Nelson's letter on March 10, 2023, stated that the additional days of suspension and/or recommendation of expulsion would be determined at a student discipline hearing on Monday, March 27th, at 1:00 p.m., conducted by the District's Assistant Superintendent of Student Services, Dr. Tori Cain. *See* Ex. 1, Nelson Affidavit, ¶ 12; *see also* Ex. 6, Discipline Packet, at PSD000013-000014.

40. Prior to the hearing on March 27th, 2023, Plaintiffs were provided with statements from the District's witnesses, the handwriting samples, pictures of the written threats, and Ms. Driy was allowed to view video footage of Cameron entering the relevant bathrooms. *See* Ex. 4, Wright Depo, 48:23-1, 49:19-22 ("Q: And prior to the hearing, you and your mom were given statements from the district's witnesses, right? A: Yes. … Q: I just want to cover, but these statements, all of these statements were provided to you guys before the hearing, right? A: Yes."), 50:15-20 ("Q: And the district, prior to the hearing, if you recall, the district provided you and your mom also with a sample handwriting that the district used to compare to the writing on the wall; is that correct? A: Yeah."); Ex. 7, Driy Depo, 29:10-30:12 ("Q: So did you attend that disciplinary hearing on March 27th, 2023? A: Yes. Q: And before that, you were provided with statements from the district's witnesses, right? A: Correct. Q: And that included statements from Cameron's friends, the student who discovered the threat, [the] teacher who said he was acting out of the ordinary, included his statement, and also a statement from the district's IT employee

who reviewed the laptop; does that sound right? A: Yes. Q: And prior to the hearing, the district also provided you and Cameron with pictures of the written threats and the messages, like, the Snapchats from the friends? A: Yes. Q: And then, prior to the hearing the district provided you and Cameron the sample that they used to compare the handwriting on the walls, right? A: Yes. Q: And you were also allowed to review the video footage of him going into both bathrooms, right? A: I was allowed, right before the hearing, to review them, and they only showed him entering the bathroom, which was never a denied thing.").

41. On March 27, 2023, the District conducted a disciplinary hearing to determine if Cameron's discipline should be extended. *See*, Ex. 7, Driy Depo, 29:10-12 ("Q: So did you attend that disciplinary hearing on March 27th, 2023? A: Yes."); Ex. 4, Wright Depo, 48:20-22 ("Q: So, did you attend a disciplinary hearing on March 27th, 2023? A: Yes.").

42. Plaintiffs attended the March 27, 2023 hearing with Ms. Driy's husband, Cameron's father, and the family's attorney. *See*, Ex. 7, Driy Depo, 31:15-24 ("Q: So, who all attended the hearing on the 27th? ... A: Myself, my husband Cameron and Cameron's father. Q: Did you also have an attorney at that meeting? A: Oh, and my attorney, sorry.").

43. Plaintiffs' attorney spoke at the hearing and presented evidence, including a polygraph examination and handwriting analysis, and Ms. Driy spoke at the hearing. *See* Ex. 4, Wright Depo, 54:11-18 ("Q: So, do you remember any hearing at all where you guys presented polygraph test and/or handwriting experts? A: Yeah, I – I remember that did happen. Q: When was that? A: I couldn't tell you, I don't remember. Q: And was your lawyer at that hearing? A: I'm sure he was."); Ex. 7, Driy Depo, 31:25-32:5 ("Q: Did you ever say that you wanted to speak at the hearing? A: I'm not sure if I requested, but I did speak. Q: Okay. So you did speak at the hearing? A: I believe so, yes."), 33:20-34:1 ("Q: … did you guys present any evidence at the

hearing. Do you recall what evidence you presented? A: Yes. We had, at that time, we had already had the lie detector test and the handwriting analysis. I don't remember what all else I had at the time, but I know I had those two.").

44. Cameron was never told he could not speak at the meeting, nor did his attorney ask to let him speak. *See* Ex. 4, Wright Depo, 52:25-53:3 ("Q: … did anyone tell you that you could not speak or share your side of, your version of events at this hearing? A: No."), 55:21-23 ("Q: But you don't think that you asked to speak and they said no? A: No."), 58:18-19 ("Q: Did your attorney ask to let you speak? A: I don't think so."); Ex. 7, Driy Depo, 33:4-7 ("Q: Did you ever hear anyone say that Cameron could not speak during the meeting or couldn't share his version of events? A: No.").

45. After the hearing, Plaintiffs were notified that Cameron could return to school on March 30th, 2023, meaning his suspension was not extended, and Cameron in fact did return to school March 30th, 2023. *See* Ex. 4, Wright Depo, 57:20-23 ("Q: And the letter says that [Dr. Nelson] accepted Dr. Cain's recommendation that you be allowed to return to school on March 30th, right? A: Yes."); Ex. 7, Driy Depo, 36:14-18 ("Q: So, on March 29th, 2023, you were notified that Dr. Nelson, the superintendent, had upheld the recommendation to impose just the ten [days] suspension, right? A: Correct."), 37:14-16 ("Q: Cameron was allowed to return to school March [30th], 2023, right? A: Correct."); *see also*, Return to School Letter ("Return Letter"), Plaintiff's Initial Disclosures p. 30, attached hereto as Exhibit 8.

46. Ultimately, Cameron received a ten (10) day suspension from school for Level III, 13: Threats to Bring Weapons or Harm to Individuals or School Property, from March 8th – 29th, 2023, which amounted to ten (10) school days because the District's spring break was in the

middle of Cameron's suspension. *See* Doc. 1, at ¶¶ 23, 37(b) on p. 9, 47(b) on p. 10, 34(b) on p. 11; *see also See* Ex. 1, Nelson Affidavit, ¶ 13.

47. Cameron received credit for all the schoolwork he completed while suspended. *See* Ex. 4, Wright Depo, 59:22-25 ("Q: So, you received credit for all of the work you did when you were out of school, right? When you were on suspension? A: Yeah."); Ex. 7, Driy Depo, 37:17-19; 38:14-16 ("Q: And while he was out of school, was Cameron able to complete work on an online platform? A: Eventually. … Q: And he received credit for all of that work, right? A: Yes.").

48. Cameron ultimately graduated on time, in May of 2025. *See* Ex. 4, Wright Depo, 91:16-17 ("Q: You did graduate in May, 2025, correct? A: Yeah."); Ex. 7, Driy Depo, 60:23-25 ("Q: Cameron graduated on time in 2025 in May, right? A: Correct.").

## IV. PLAINTIFFS' CLAIMS

49. Plaintiffs believe the District suspended Cameron for ten days because he was suspected of writing the threats on the School's bathroom walls. *See* Ex. 4, Wright Depo, 67:2-3, 8-10 ("Q: So, why do you think that the District suspended you for ten days? … A: Just, you mean, because of this. Q: They thought it was you? A: Yeah."); Ex. 7, Driy Depo, 44:8-12 ("Q: Why do you believe that the district suspended Cameron for ten days? A: They [suspected] him writing on the walls. Q: The threats? A: Yes.").

50. Cameron and Ms. Driy were unaware of the identities of any other student at the School who were accused of the same conduct as Cameron, and they were unable to say if Cameron's treatment was different than any other student's treatment. *See* Ex. 4, Wright Depo, 67:11-22 ("Q: Are you aware of any other students while you were at Pattonville who were accused of making a terroristic threat or threatening to shoot up the school? A: No. But, we did

receive threats prior to that and then while I was suspended, they received more threats as well. Q: And but, did you know anybody that was accused of making those threats? A: Huh-uh. Q: Got it. Sorry, that was a no? A: Yeah, I don't know anyone."); Ex. 7, Driy Depo, 44:13-25 ("Q: Are you aware of any other students while Cameron was at Pattonville who were accused of making terroristic threats or threatening to shoot up the school? A: I don't know who they are, but there was tons of them, including the week that he was suspended. Q: And you said you don't know who any of the students were? A: I don't know their names, no. Q: Do you know male, female, any race or anything? A: I do not know."), 45:9-15 ("Q: Do you believe that the district treated Cameron differently [than] it treated other students by suspending him for ten days? A: I don't know what they did with the other students. Q: So you're not sure? A: Correct."), 45:16-21 ("Q: So you couldn't say, and I know this is a little repetitive, but you couldn't say one way or another if you think that his treatment was different than what they would have done with another student? A: Correct.").

51. When asked why he felt like the District treated him differently because of his race (white) and sex (male), Cameron reported that it was just a feeling, but he could not list any specific examples or comparators. *See*, Ex. 4, Wright Depo, 68:25-69:4 ("Q: Do you believe that the district treated you differently because of your race? A: I would like to say that's the way I felt. I can't think of, like, any specific examples, but that's just how I was feeling during that."), 70:1-5 ("Q: Are there any other reasons why you feel that the district treated you differently because of your race? A: Not necessarily, that's just the way I felt and the vibe that I was getting."), 102:21-103:1 ("Q: And do you think there's any specific individuals that made this decision that did – that they thought that because you're white that it was more likely that you did this? A: No, I think they all just collectively had that thought in their head."), 103:8-11 ("Q:

So you don't remember any comments that anybody made that make you think that this decision was because of your race? A: Yeah, I can't remember."), 108:24-109:17 ("Q: Were there any actions that Ms. Ashford or Mr. Beucke took that made you think that they were treating you differently because you're a male? A: Not necessarily[, just] that they decided to keep the investigation going. Q: So you think that because they investigated you over this period, that that shows that they were treating you different because you're a male? A: Yeah, I think that just shows another reason of them using stereotypes to conduct their research. Because I think there's a clear lack of evidence and there's just no other solution that I can think of for why they would think that. Q: So you're just guessing because you can't think of another reason? A: That, and I just see it all the time in the school [sic] happening. I feel like if you would ask any other student at the high school that they would agree with me."), 109:24-110:7 ("Q: And it sounds like it's mostly you feel like they are closer with female students. Does that sound about right? A: Yeah. Q: Okay. Any other comments or actions by any person who is part of the disciplinary decision that you feel show that it's because of your – because you're a male? A: No.").

52. Ms. Driy is likewise unaware if the District treated Cameron differently because of his race or gender. *See* Ex. 7, Driy Depo, 50:8-22 ("Q: Do you believe that the district treated Cameron differently because of his race? A: I don't know specifically. Q: Do you believe that students of different races were treated less harshly than Cameron? About, like, the situation or? Q: If, like, they were in a similar situation do you believe that they were treated less harshly? A: I don't know. Because I don't know who the other .. I don't know who the other students were or anything of that nature."), 50:23-51:2 ("Q: Do you believe, in general, that Pattonville disciplined white students more harshly than students of other races? A: I don't know about any discipline that they do with any other kids."), 51:20-52:1 ("Q: Do you think that the district

treated Cameron differently because he's a male? A: I mean, I don't know when you say differently, because I – I don't have anything to compare it to because – as far as discipline, because I don't know how the other kid was disciplined."), 52:5-14 ("Q: So do you believe that any female student was treated less harshly than Cameron? A: I don't know. Q: Okay. Do you believe that Pattonville disciplined male students more harshly than females? A: I don't know. Q: And do you believe that female students got more opportunities to contest allegations against them, like, in disciplinary situations? A: I don't know.").

53. Dr. Tim Pecoraro, the District's former Superintendent of Schools, was not employed by the District in 2023. *See* Ex. 1, Nelson Affidavit, ¶ 14.

54. Gene Grimshaw is an Associate Principal of Pattonville High School. *See* Ex. 1, Nelson Affidavit, ¶ 15.

55. The District does not and has not employed an individual by the name of Jeff Grimshaw. *See* Ex. 1, Nelson Affidavit, ¶ 16.

Respectfully submitted,

TUETH KEENEY COOPER MOHAN & JACKSTADT, P.C.

By: */s/ Mandi D. Moutray*
Michelle H. Basi, #54943MO
Mandi D. Moutray, #66096MO
Sarah P. McConnell, #74216MO
34 N. Meramec Avenue, Suite 600
St. Louis, MO 63105
(314) 880-3600
mbasi@tuethkeeney.com
mmoutray@tuethkeeney.com
smcconnell@tuethkeeney.com

***Attorneys for Defendants***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies on this 7th day of May 2026, the foregoing was served by the Court's electronic court filing notification system upon all counsel of record.

*/s/ Mandi D. Moutray*