EXHIBIT 4



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

NIKKI DRIY, individually and )
on behalf of her minor son, )
C.W., )
)
Plaintiff, )
) Case No.
vs. ) 4:25-cv-00536-CDP
)
PATTONVILLE HIGH SCHOOL, )
PATTONVILLE SCHOOL DISTRICT, )
et al., )
)
Defendants. )

DEPOSITION OF CAMERON WRIGHT
TAKEN ON BEHALF OF DEFENDANTS
April 3, 2026

PAMELA G. WILLIAMS, RPR
MISSOURI CCR #880

Q. Okay. Have you made any posts that you've since deleted on any of those platforms?
A. No.
Q. Got it. Have you ever been arrested for anything?
A. No, other than this.
Q. Right. Have you ever been, other than this, convicted of or pled guilty to any crimes?
A. No.
Q. Okay. Ever been party to any other litigation?
A. What does that?
Q. So, this lawsuit that you're currently in, have you ever been a part of any other lawsuit, like, you've claimed something against another party like you're claiming against Pattonville, or another party has claimed something against you?
A. No.
Q. Okay. And what is your highest level of education?
A. I'm a high school graduate.
Q. When did you graduate?
A. 2025.
Q. Got it. So, about a year ago. Are you currently receiving education?

Pattonville when you were there.
Did you attend for all four years of high school, were you at Pattonville?
A. Yeah.
Q. Got it. Did you have, like, a big group of friends, like a small close group of friends, what was your social life like?
A. Yeah. Early on for high school I had a pretty big group of friends. I knew a lot of people.
Q. Boys and girls or?
A. Yeah. And there was, like, not like any specific group, it was pretty much everyone.
Q. You were, yeah, friends with everybody?
A. Yeah.
Q. Did you have, like, a couple best friends or anything?
A. Yeah, I would say so.
Q. Okay. Who were, like, your best friends in high school?
A. In high school, one of my best friends I still hang out with for sure would be my friend Aaron and then --
Q. What's Aaron's last name?
A. Jackson. And that might, honestly, be the

A. Yeah.
Q. So you drove him to your place and you guys were both at your house napping?
A. Yes.
Q. And then, did your mom come get you or did the police come to get you?
A. So, I was woken up by hearing my mom screaming my name from upstairs. And that's when I came upstairs.
Q. And what did the police say when you were -- well, after you came upstairs?
A. I'm not sure if they said anything to me directly. I think they just told me I was under arrest.
Q. Did you hear them say anything to your mom?
A. Yes, but I don't remember what they were saying, but I know they were talking.
Q. So, you were then arrested by the police on March 6th of 2023; is that correct?
A. Yeah.
Q. And that's the same day that those threats were found on the bathroom wall, right?
A. Yes.
Q. And the police believed that they had a reason to arrest you, correct?

A. Yes.

Q. When you were arrested, did the police officers tell you that the district had a video of you going into both of the bathrooms that had the threat?

A. Yeah, they were -- yeah, the cop was telling me that on the way to the police department.

Q. Got it. What police department did he take you to?

A. He took me to Maryland Heights and then we went to the juvenile center from there.

Q. And did the police officer also tell you that they had a handwriting sample that they used to determine that they thought it was your handwriting on the walls?

MS. SANGMOR: Objection.

Q. (By Ms. McConnell) So, usually with an objection, your attorney can say why she's objecting and usually you can still answer, unless your attorney directs you not to. But you can still answer, then we all can fight about the objections later.

So, I can ask the question again if you've forgotten, but, like, you can still answer over her objection, unless she instructs you not to

answer, and then you're free to listen to her advice.
A. What was the question?
Q. So when you're arrested, I asked if a police officer also told you that they had a handwriting sample that they used that to determine that they thought it was your handwriting on the walls?
A. So, I don't -- Can you say that --
Q. Did they -- did the police tell you that they thought that the handwriting on the wall matched your handwriting?
A. Yes, they did say.
MS. SANGMOR: Objection, it calls for speculation.
Q. (By Ms. McConnell) I mean, I'm asking what -- yeah, that's fine.
So, you knew on March 6th that you were suspected of writing the threats on the bathroom walls, correct?
A. Once I was arrested, yes.
Q. Got it. When did the district first contact you or your mom about the threats?
A. I don't think my mom got contacted until I got home that night. And I wasn't ever contacted about anything.

Q. Got it. Would you have any reason to dispute that Mr. Beucke called your mom the evening of March 6th to ask you to give your side of the story?
A. I don't remember it happening.
Q. But you knew on March 6th that the district thought that you had written those threats that were on the wall that day?
A. Yes, but I --
MS. SANGMOR: Objection.
Q. (By Ms. McConnell) You can answer.
A. I didn't hear -- so, not directly from the district though, it was just from what the police officers were telling me.
Q. And do you know, and it's okay if you don't, I'm just asking if you know what the district did, if anything, to determine that one person wrote both of the threats that were on the bathroom walls?
A. No. They just told me I went in both of the bathrooms.
Q. When did they tell you that?
A. I'm sorry, the district, when did the district tell me that?
Q. Yeah.
A. Not until we had my hearing. That was

pretty much the time first time I talked to any of them.
Q. Did you meet with the district on March 7th with your mom?
A. Would that have been at the high school?
Q. Yes.
A. We -- so, yeah, we did meet with them at the high school, but they wouldn't talk to us because I brought my lawyer with me.
Q. Who else went with you?
A. It was my mom was with me, my lawyer, and I believe my step dad was.
Q. Got it. And during that meeting, you were given a piece of paper and asked to provide a statement; is that right?
A. Yeah.
Q. And you did provide a statement to the district, right?
A. Yes, but not that -- not that -- at the school. I went home and I did it.
Q. You typed it?
A. Yeah.
Q. And I'm going to pull out what I have marked as Exhibit 10. And this is going to be the disciplinary packet.

MS. MCCONNELL: Yes.
MS. SANGMOR: Okay. Thank you.
Q. (By Ms. McConnell) So, I'll just repeat the question, but this is a true and accurate copy of the statement that you provided, correct?
A. A true inaccurate?
Q. And accurate. Like, this is the statement that you provided to the district?
A. Okay, yeah.
Q. Yeah. And you provided this statement on March 7th, right?
A. I believe so, yes.
Q. And the district asked you to bring your laptop to that meeting on the 7th, right?
A. Yeah.
Q. But you didn't bring it that day, did you?
A. We did bring it.
Q. You did bring it that day?
A. Yes, but no one asked us to grab it or anything, so.
Q. Someone had to go to your house to retrieve the laptop and then bring it back. Does that sound right?
MS. SANGMOR: Objection, asked and answered.
Q. (By Ms. McConnell) You can still answer over

A. Yeah, it was just my phone that was connected to my laptop.

Q. So it's like you disconnected your phone from the laptop, basically?

A. Yeah.

Q. Okay. And then, I'm going to ask you to flip a few pages earlier to PSD 000017. Yes.

MS. SANGMOR: Okay.

Q. (By Ms. McConnell) Do you recall seeing this document?

A. I don't recall seeing it, but I'm sure I've seen it before.

Q. Got it. So, you were notified by the district that you were going to be suspended from March 8th until March 29th, correct?

A. What date was this?

Q. You can look in here in this letter. Take your time to read it if you need, that's not a problem.

A. I'll sorry, what was the question?

Q. So, you were notified that you had been suspended from March 8th through March 29th, correct?

A. Honestly, I don't remember -- I remember the suspension starting later than that, but I could be

wrong.
Q. Later than the 8th?
A. But if it says right here then I probably did.
Q. Got it. You don't remember exactly, but you're assuming whatever the letter says --
A. Yeah.
Q. -- is correct. And so, according to this letter and your memory, if you can remember, you could return to school on March 30th, 2023 unless the district decided to extend your suspension, right?
A. Yes.
Q. So, this notification, like, this letter, came after you already knew that the district suspected that you wrote these threats on the bathroom walls?
A. Yes.
Q. And it came after you provided a statement to the district with your response, right? Which is the statement we just talked about?
A. Yeah, I'm pretty sure.
Q. Okay. And this letter, it also said that you could complete your work that was missed for full credit, right?

hearing would be conducted on March 27th, right?
A. Yeah.
Q. And in the letter you were notified that copies of relevant statements would be provided to you if you requested, right?
A. What are you saying, copy of relative statements?
Q. Relevant statements. So if you guys asked the district for relevant statements, they would, like, that are related to this incident, they would provide them to you before the hearing. And if you look, it is, it's the second to last paragraph on page 13.
A. Okay.
Q. And it says in this letter that you can have legal counsel, right?
A. Yes.
Q. And that's, I think that's on the next page.
A. Okay, I see it.
Q. So, did you attend a disciplinary hearing on March 27th, 2023?
A. Yes.
Q. And prior to the hearing, you and your mom were given statements from the district's witnesses, right?

A. Yes.
Q. And these were, like, statements from your friends, the student who found the threat, the teacher who said that you were acting out of the ordinary, and who provided your handwriting sample, and the district's IT employee who reviewed your laptop; does that sound right?
A. Yeah, these were -- there was a -- there was another -- I saw it in here. Yes, they did and it was this statement right here.
Q. What page are you on?
A. On PSD 32. It was student statement J. This statement was sent to us, but it was not included in the hearing.
MS. SANGMOR: Cameron, let me see what you're referring to. Okay. Who wrote that statement? I object because there's no -- there's no signature or anything, objection.
Q. (By Ms. McConnell) I just want to cover, but these statements, all of these statements were provided to you guys before the hearing, right?
A. Yes.
Q. And the district also provided you and your mom with pictures of the written threats and messages received from everybody else, like, all

these other statements?
A. At the hearing?
Q. Prior to the hearing, so before.
A. I don't know if I was ever able to see the picture of the actual threat that was written until the hearing. I don't really remember.
Q. And if I say that you -- that you were provided these statements before, would you have any reason to dispute that or to say that that's not true?
A. Other than I just don't really remember it.
Q. Yeah, that's fair. It's been a couple years.
A. Yeah.
Q. And the district, prior to the hearing, if you recall, the district provided you and your mom also with a sample handwriting that the district used to compare to the writing on the wall; is that correct?
A. Yeah.
Q. Or, to the best of your knowledge?
A. Yes.
Q. Ands prior to the hearing, your mom was allowed to review the video of you entering those bathrooms, right?

A. Yeah.
Q. Okay. So he attended the hearing and your mom and maybe your step dad, you're not sure?
A. Yeah.
Q. And anybody else?
A. No, that was it.
Q. Do you recall if your attorney at that time attended with you?
A. I don't remember.
Q. You don't remember. And what is your recollection of what happened during that meeting or during the hearing?
A. During that hearing, what I remember it was just them asking me questions about the documents they had. And what I remember it was pretty much just them asking me questions.
Q. Did you speak at the hearing? It sounds like you answered questions at least?
A. I think I answered a little bit, but if I remember, I don't think I was given, like, the fair opportunity to speak. I remember being cut off a lot.
Q. Who do you remember cutting you off?
A. I don't remember.
Q. Did you -- did anyone tell you that you

could not speak or share your side of, your version of events at this hearing?

A. No.

Q. And did you deny at the hearing that you wrote those threats?

A. Yeah.

Q. Do you recall your attorney speaking?

A. No, I don't remember.

Q. Got it. Do you remember your mom speaking?

A. I'm sure she -- I can't think of any specifics, but I'm sure she did.

Q. Do you remember if anybody presented any evidence at the hearing? Like, did you guys present evidence? It sounds like you might have had experts. Do you remember any of that being presented there, like polygraph, a handwriting expert?

A. Not at the first hearing.

Q. What other hearing was there?

A. I don't really remember. I'm pretty sure we had more than one.

Q. Are you thinking of, for the hearing, are you thinking of the first one being like the meeting with the district?

A. Could have been. Was that -- Do you know if

it was at the learning center or not?
Q. I am not sure. Yeah, I don't recall, but the hearing would have been one with, like, Tori Cain in it and the superintendent.
A. Would the superintendent Ms. Ashford?
Q. That's -- she would have been there, too. She's the principal. The superintendent is Barry Nelson, really tall guy.
A. I don't remember going to anything and Barry Nelson being there.
Q. So, do you remember any hearing at all where you guys presented polygraph test and/or handwriting experts?
A. Yeah, I -- I remember that did happen.
Q. When was that?
A. I couldn't tell you, I don't remember.
Q. And was your lawyer at that hearing?
A. I'm sure he was.
Q. And what else do you remember from that hearing where you presented this evidence?
A. Nothing really, to be honest.
Q. So, have you talked about everything that you remember from your hearing with the district? Feel free to take a second, if you want to think for a minute.

A. Yeah, I really don't remember much about the hearing except that the one statement wasn't included and I felt like I didn't get a fair chance to speak or say what I really wanted to. And I think some of the things they were saying weren't true.

Q. When you say they, who are you talking about?

A. Ms. Ashford being one of them.

Q. What was she saying that you didn't feel was true?

A. I'm not sure exactly what it was, but I remember one of them, it was something about me going into the bathroom by myself, but I remember thinking that wasn't true because I walked in there with other people. And I -- I did try to say something, but I don't think I was able to.

Q. And do you think that you were just cut off when you tried to say something?

A. Yeah.

Q. But you don't think that you asked to speak and they said, no?

A. No.

Q. Was that a no?

A. Yeah, no, that...

mark this as Exhibit 11.

(Whereupon, Defendant's Deposition Exhibit No. 11 was marked for identification by the reporter.)

Q. (By Ms. McConnell) You can take a look at this one.

A. Okay.

MS. SANGMOR: Cameron, can I see it?

THE WITNESS: Yeah.

MS. SANGMOR: Okay.

THE WITNESS: Okay, yeah. The date doesn't sound right to me.

Q. (By Ms. McConnell) Confusing language because it's saying that you got a ten day suspension on the 29th, but that that had already been served, so you could return the 30th; is that correct?

A. Yeah, I guess so.

Q. And the letter says that he accepted Dr. Cain's recommendation that you be allowed to return to school on March 30th, right?

A. Yes.

Q. And do you know what, if anything, the superintendent did to make this decision?

A. No.
Q. That's totally fine.
A. I don't think he did much, I think he just signed it.
Q. Fair enough. What makes you say that?
A. I didn't hear anything from him, like, the whole time and I just, I don't think he really even know what was going on, really.
Q. And then, so you said you don't -- you didn't feel like you had a fair chance to speak at the hearing. Why do you feel that way?
A. Just, I feel like they were asking me questions to try to trick me to answer to try to incriminate myself and I just don't think the questions they were asking were fair. And I think I should be able to give my own statements about what I think.
Q. Did your attorney ask to let you speak?
A. I don't think so.
Q. Got it. And then, while you were out of school, were you able to complete work on some sort of online platform?
A. Yes, but that was -- that wasn't until they gave me a loaner laptop because they took my laptop for evidence.

Q. Do you recall when they gave you the loaner?
A. No.
Q. Do you know if it was -- So, if the 6th was a Monday and you met again on Tuesday the 7th, it sounds like Tuesday the 7th is when they took the laptop; is that right? When you went into the school to talk to them with your mom?
A. Yeah, that sounds right.
Q. And then, do you think they gave you the loaner, like, the Wednesday, the next day, or Thursday?
A. It was -- I don't think it was till that Monday, if I'm right, because my -- I believe my step brother had to go up there and grab it for me.
Q. Is that Landyn?
A. Yeah.
Q. If we said that you got it -- if you got a loaner on March 9th, do you have any reason to dispute that?
A. No.
MS. SANGMOR: Objection.
Q. (By Ms. McConnell) So, you received credit for all of the work you did when you were out of school, right? When you were on suspension?
A. Yeah.

A. Uh-huh.
Q. So, why do you think that the district suspended you for ten days?
MS. SANGMOR: Objection. Calls for speculation.
Q. (By Ms. McConnell) You can answer with why you think they suspended you.
A. Just, you mean, because of this.
Q. They thought it was you?
A. Yeah.
Q. Are you aware of any other students while you were at Pattonville who were accused of making a terroristic threat or threatening to shoot up the school?
A. No. But, we did receive threats prior to that and then while I was suspended, they received more threats as well.
Q. And but, did you know anybody that was accused of making those threats?
A. Huh-uh.
Q. Got it. Sorry, that was a no?
A. Yeah, I don't know anyone.
Q. You don't know anyone, okay.
So you just know the school got threats, like, written on walls, I'm guessing?

A. Yeah, I guess so.
Q. Got it. And but you don't know who was accused of doing any of those things?
A. Yeah, no.
Q. Okay. Do you believe that the district treated you differently than other students when they suspended you for ten days?
A. Yes, I would say it more as, like, a biased opinion for them. Like, I think if -- I think if I was, like, more of a teacher's pet or something, like, they wouldn't necessarily think it was me.
Q. So, you think that the district treated you differently because maybe you weren't --
A. I was just, like, a little different. Like, my hair was longer and I dressed a little different, so.
Q. Yeah. Not like the stereotypical teacher's pet, perfect student?
A. Yeah. I think -- yeah, I think they were stereotyping me.
Q. Any other reason why you think that they treated you differently than other students or just the stereotyping?
A. Just the stereotyping.
Q. Do you believe that the district treated you

differently because of your race?

A. I would like to say that's the way I felt. I can't think of, like, any specific examples, but that's just how I was feeling during that.

Q. And why did you feel that way?

A. I can't think of, necessarily, a specific example. I just think maybe, like, whoever -- I just think if you're more similar to whatever teacher or principal is, then they like you more.

Q. So, did you not feel that you were similar to teachers or principals?

A. No, not really. They all -- they all, like, had their favorites and stuff and a lot of kids were able to get away with a lot.

Q. Is that because of -- You're saying it's because of race?

A. Just because of -- I wouldn't necessarily -- not necessarily, like, just because of race, but that would be, like, a part of it just because of their -- like, an example would be, like, a lot of the black coaches would, like, would, like, talk to the black kids more and stuff. And they would let the black kids get away with a lot. Or, like, with, like, the girl teachers, they would let the girls do what they want a lot.

Q. Are there any other reasons why you feel that the district treated you differently because of your race?
A. Not necessarily, that's just the way I felt and the vibe that I was getting.
Q. Do you think that Pattonville disciplined white students more harshly than students of other races?
A. Yes.
Q. And why do you think that?
A. I think because the -- the teachers that would have to deal with the kids being disciplined, so like the -- like, for an example, the ISS teacher, he would let a lot of, like, the black kids he knew, like, get away with a lot of stuff. And same with, like, the coaches and the kids that they coached.
Q. Who's the ISS teacher?
A. Was Coach Bryant.
Q. And what is his race?
A. He was black.
Q. So, what other reasons do you have for thinking that Pattonville disciplined white students more harshly than students of other races?
A. Well, I wouldn't necessarily say it --

school. But you can't really do all your classes in summer school, it's a lot. So, it caused me to not be -- not have as many credits as I should have. Like, I was supposed to graduate a whole semester early and I wasn't able to either. And then I had to redo some of my classes, too.

Q. How many classes did you have to redo?

A. I think I did two or three over summer school and then the rest was at whenever the next semester would be.

Q. So you were planning on graduating early?

A. Yeah, I was already ahead in credits from middle school. Which is the only reason why I was able to graduate on time.

Q. Got it. And I was going to ask that next. You did graduate in May, 2025, correct?

A. Yeah.

Q. Which is, like, the standard time it takes a student to graduate, like, the K through 12?

A. Yeah.

Q. Okay. Are there any other ways that you feel you suffered academically?

A. Well, me being depressed and not wanting anything to do with Pattonville, it made me just kind of give up on school that year.

anybody involved in the decision?
A. I mean, I feel like all of them just all the stereotype. And I also think that because when I'm -- they said they did a detailed handwriting analysis and I think when I look at the actual thing that was written on the wall, then you look at my handwriting, I don't think it matches at all. And with the only -- with the only other evidence me being with -- the only other evidence is me walking into the bathroom and I think they used stereotypes to get to the decision that I was the person who did it, due to lack of evidence.
Q. Got it. So why do you think that they made that decision because of your race? Like, what makes you think it was because you're white?
A. I think because most of the school shooting cases are white males and it would be a lot easier to prove or a lot more believable of it being a white male rather than, like, a black male or a black female.
Q. And do you think there's any specific individuals that made this decision that did -- that they thought that because you're white that it was more likely that you did this?
A. No, I think they all just collectively had

that thought in their head.

Q. Was there any comments that anyone made that suggested they made this decision because of your race?

A. I would -- I want to say was what -- because Mr. Gross had said something to one of my classmates. I can't remember any specifics, no.

Q. Got it. So you don't remember any comments that anybody made that make you think this decision was because of your race?

A. Yeah, I can't remember.

Q. Are there any actions that anybody took specifically that you think show that they made this decision because of your race?

A. No, other than -- other than them choosing me out of everyone that walked in the bathroom that day because my friend, Julio, walked in one of the bathrooms I know, which he is Hispanic. And I remember they were also in the other bathroom, the day they said -- in the H wing bathroom I remember there also.

REPORTER: I'm sorry, in the what bathroom?

THE WITNESS: It was in the H wing. If I remember right. I remember there also being a black kid in there at some point. And it's just the fact

it.
Q. But you're not sure?
A. I'm not sure yeah.
Q. Got it. Are there any comments that Ms. Ashford or Mr. Beucke made that made you think that they treated you differently because of your sex?
A. No.
Q. Are there any actions that they took that made you think they treated you differently?
A. Them continuing to push the trial off.
Q. When you say trial, do you just --
A. Or, whatever the last court that I had.
Q. Hearing, to the hearing that you had?
A. It was -- pretty sure it got pushed to trial, I think. That hearing, then I had an actual court date in front of the judge.
Q. That was -- That would have been in the criminal case. So this --
A. Oh, okay.
Q. This is just like a civil case, so this is just your suit against us.
A. Okay. Can you repeat the question again?
Q. Were there any actions that Ms. Ashford or Mr. Beucke took that made you think that they were

treating you differently because you're a male?
    A. Not necessarily that they decided to keep the investigation going.
    Q. So you think that because they investigated you over this period, that that shows that they were treating you different because you're a male?
    A. Yeah, I think that just shows another reason of them using stereotypes to conduct their research. Because I think there's a clear lack of evidence and there's just no other solution that I can think of for why they would think that.
    Q. So you're just guessing because you can't think of another reason?
    A. That, and I just see it all the time in the school it happening. I feel like if you would ask any other student at the high school that they would agree with me.
    Q. Right. And I, like, get that there's certain things that students think, but I just want to make sure because we're not in the high school and we're only talking to you. I just want to make sure that we're getting everything that you're experiencing.
        And it sounds like it's mostly you feel like they are closer with female students.