EXHIBIT 7



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

NIKKI DRIY, individually and on behalf of her minor son, C.W., )
)
Plaintiff, )
) Case No.
vs. ) 4:25-cv-00536-CDP
)
PATTONVILLE HIGH SCHOOL, PATTONVILLE SCHOOL DISTRICT, et al., )
)
Defendants. )

DEPOSITION OF NIKKI DRIY
TAKEN ON BEHALF OF DEFENDANTS
April 3, 2026

PAMELA G. WILLIAMS, RPR
MISSOURI CCR #880

going on. He kept asking for what and they kept just saying, you know what you did. And then they told me that they were going to take him to Maryland Heights Police Station and book him and fingerprint him and handcuff -- or, and take his picture or whatever, and then I could meet them, meet him at Clayton for the juvenile center.

Q. Got it. So, Cameron was arrested by the police March 6th, right?

A. Yes.

Q. And that's the same day that those threats were found in the school?

A. Yes, it was only, from the time he got home to the time they showed up, a couple hours.

Q. Got it. And the police, you -- to your understanding, the police thought they had probable cause to arrest Cameron, right?

A. I would assume, so.

Q. When Cameron was arrested, a police officer told you that the district had video of Cameron going into both bathrooms, right?

A. No, I was not aware at that time. They said that they -- after I, you know, assumed it was for that, I asked to see the handwriting -- or, they said that they compared, they analyzed it or

compared it and the handwriting matched is what they kept saying.
Q. Got it. When were they saying that to you?
A. In the house before he left.
Q. Okay. So, you knew that day that, on March 6th, that Cameron was suspected of writing the threats on the bathroom walls of school, right?
A. I assumed by the conversation with the police when they showed up at my door.
Q. Sure. When did the district first contact you about the threats?
A. Later that evening.
Q. And what did they say?
A. They asked if I could bring Cameron in the next day so they could be begin their investigation.
Q. Did you know what the district did, if anything, at that point to determine that one person had written both of the threats?
A. No, I was not aware that there was two at the time.
Q. Got it.
A. And the only thing I knew was that they compared the handwriting. I didn't know anything further at that time.
Q. Got it. And when did you meet with the

accurate, like, for your knowledge, you know.
A. I'm sure it is. It probably, it was written closer to the timeline, so it's probably more fresh than what I remember.
Q. Sure. So you said you went to the school on the 7th, it'd be the next day the 7th --
A. Uh-huh.
Q. -- with your husband and a lawyer and Cameron?
A. Cameron, uh-huh.
Q. Okay. Who was the lawyer that appeared then?
A. Water Kotte.
Q. Can you spell that for me?
A. Yeah. It's Water and then K-O-T-T-E.
Q. Got it. During that meeting, Cameron was given a piece of paper and asked to provide a statement, right?
A. Yes.
Q. And did you provide a statement to the district?
A. Yes. I can't remember if he wrote it right then or later and we sent it, but, yes.
Q. I'm going to show you what I have previously marked as Exhibit 10.

just a few pages before.
MS. SANGMOR: And, Nikki, if you could hold it up for me, that would be great.
THE WITNESS: Sure.
MS. SANGMOR: Okay. All right. Thanks.
Q. (By Ms. McConnell) Do you recall seeing this document?
A. Yes.
Q. So you were notified on March 8th that Cameron was suspended for ten days, right?
A. Was that a -- was that the Wednesday?
Q. Yeah. Yeah.
A. I believe it was March 8th.
Q. Got it.
A. It was -- I know that my lawyer e-mailed them and said that we were going to send him to school the next day, which was Thursday, if they didn't, so I believe that they responded that night and said that he was suspended.
Q. Got it. And you were told that this suspension would start March 8th and would go through the 29th?
A. I believe so.
Q. And you can look at the letter. And that Cameron, this would mean that Cameron could return

to school on March 30th, unless the district decided to extend the suspension; is that correct?
A. They said we had to -- correct. They were going after a hundred and 80 day plus suspension and that they could only legally suspend him for ten days and then -- without a disciplinary hearing. So we would go to a disciplinary hearing to determine, but they were trying to suspend him for longer.
Q. That's your understanding of this letter?
A. That was my understanding of what they told me.
Q. Got it. So this notification, this letter here, was after you knew that the district suspended --
A. Oh, it says it here, yeah.
Q. Yeah. This was after you knew that the district suspected Cameroon of writing threats on bathroom walls, right?
A. Correct.
Q. And it came after he provided the statement on March 7th to the district with his response to the allegations, right?
A. Correct.
Q. And the letter also notes that Cameron could complete work missed for full credit, right? Feel

I can't recall for certain if it was e-mail or phone call, that they were going to suspend him and that's where we had the conversation that I mentioned. And then, at that time, they did not tell me that he could do school work.

Q. And can you turn to PSD 13, it's just a few pages before. It's 13 and 14, they're together.

A. Okay.

MS. SANGMOR: Can you hold it up, Nikki? Okay.

Q. (By Ms. McConnell) Have you seen this document before?

A. Yes.

Q. So on March 10th, you were notified in this letter that Dr. Nelson may extend Cameron's ten day suspension for a period of up to 180 days or expulsion, would be determined at a hearing, right?

A. Correct.

Q. And this letter states that the suspension may be extended, right?

A. Correct.

Q. And that the determination would be made after a hearing?

A. Correct.

Q. So this letter also notified you that the

hearing would be conducted on March 27th, right?
A. Yes.
Q. And it also told you that copies of relevant statements would be provided to you on request, right?
A. Yes.
Q. And indicated that you could have legal counsel, right?
A. Yes.
Q. So did you attend that disciplinary hearing on March 27th, 2023?
A. Yes.
Q. And before that, you were provided with statements from the district's witnesses, right?
A. Correct.
Q. And that included statements from Cameron's friends, the student who discovered the threat, teacher who said he was acting out of the ordinary, included his statement, and also a statement from the district's IT employee who reviewed the laptop; does that sound right?
A. Yes.
Q. And prior to the hearing, the district also provided you and Cameron with pictures of the written threats and the messages, like, the

Snapchats from the friends?
A. Yes.
Q. And then, prior to the hearing the district provided you and Cameron the sample that they used to compare the handwriting on the walls, right?
A. Yes.
Q. And you were also allowed to review the video footage of him going into both bathrooms, right?
A. I was allowed, right before the hearing, to review them, and they only showed me him entering the bathroom, which was never a denied thing.
Q. Sure. When you say right before, do you mean the day of?
A. Yes.
Q. Okay.
A. That morning, right before it.
Q. And I already asked, but the district provided you copies of these Snapchat messages that Cameron had with friends, right?
A. Correct.
Q. And can we turn to PSD 38. I mean, 37.
MS. SANGMOR: Okay, thanks.
Q. (By Ms. McConnell) Have you reviewed these before?

A. Yes.
Q. Do you know what the students are talking about in this?
A. Yes.
Q. What are they talking about?
A. Vaping.
Q. Got it. Regular vapes or, like, a marijuana vape?
A. I don't know for sure.
Q. It's hard to know, yeah.
A. Maybe both, I have no idea.
Q. Right. I just wanted to -- I wasn't sure if you knew.
A. No, I don't know.
Q. Okay. So, who all attended the hearing on the 27th? From you guys not, like, the district.
A. Myself, my husband, Cameron and Cameron's father.
Q. Did you also have an attorney at that meeting?
A. Oh, and my attorney, sorry.
Q. Okay. Just making sure. Was there anybody else?
A. No.
Q. Did you ever say that you wanted to speak at

the hearing?
A. I'm not sure if I requested, but I did speak.
Q. Okay. So you did speak at the hearing?
A. I believe so, yes.
Q. Okay.
A. I don't know how much but.
Q. Sure.
A. I was never told I couldn't speak.
Q. Got it. Did Cameron say that he wanted to speak?
A. He -- he spoke and tried to speak.
Q. What do you mean?
A. There were times that we -- that he got cut off or whatever, but yeah.
Q. Who cut him off?
A. I can't remember.
Q. Completely fine. And I said this to Cameron, too, but I know I ask a lot of questions, some of them a little bit annoying. We just want to make sure we're covering all of our bases so we understand all of the reasoning for your claim and everything that you guys are wanting and everything that you're saying is happening. So, if my questions feel a little repetitive or annoying, I'm

sorry. I promise we're just trying to get everything.

A. Okay.

Q. Did you ever hear anyone say that Cameron could not speak during the meeting or couldn't share his version of events?

A. No.

Q. Did Cameron deny that he wrote those threats during the hearing?

A. Yes.

Q. Did your attorney speak?

A. Yes.

Q. What do you remember him saying?

A. I don't know.

Q. Totally fine. Can you remember, like, anything?

A. I don't remember specific conversations. We just went over, you know, the events and the evidence we had.

Q. And I was just going to say, did you guys present any evidence at the hearing. Do you recall what evidence you presented?

A. Yes. We had, at that time, we had already had the lie detector test and the handwriting analysis. I don't remember what all else I had at

the time, but I know I had those two.

Q. And I am going to show you what I will mark as Exhibit 15.

(Whereupon, Defendant's Deposition Exhibit No. 15 was marked for identification by the reporter.)

Q. (By Ms. McConnell) I'm going to put it on the other side so it's not blocking anything. Lynda might want you to show.

A. Oh, sorry.

MS. SANGMOR: Okay, thank you.

Q. (By Ms. McConnell) Do you recognize this?

A. Yes.

Q. Is this a true and accurate copy of the polygraph exam?

A. Yes.

Q. And did you guys present this to the district at the hearing?

A. Yes.

Q. Is there anything -- we've kind of gone through what you presented. Is there anything that you recall being said at the hearing or any evidence that was shown that we have not already discussed today? Understanding the statements and everything

backpack with him.
Q. In both the videos or just one of them?
A. The one specific one that this kid had went into or whatever.
Q. Got it.
A. I don't know. I can't remember the other one, because it wasn't relevant at the time.
Q. Yeah. H wing, D wing bathrooms.
A. Yeah.
Q. Anything else that you recall being said at the hearing or shown that we have not already discussed?
A. Not that I can recall.
Q. Okay. So, on March 29th, 2023, you were notified that Dr. Nelson, the superintendent, had upheld the recommendation to impose just the ten suspension, right?
A. Correct. And I'm going to show you what I've already marked as Exhibit 11.
(Whereupon, Defendant's Deposition Exhibit No. 11 was identified for the record.)
Q. (By Ms. McConnell) Do you recognize this letter?
MS. SANGMOR: Okay.

Q. (By Ms. McConnell) Sorry, do you recognize this letter?
A. Yes. I was reading it.
Q. No problem. Also, feel free to tell me to pause after, that's totally fine.
So in this letter, Dr. Nelson further notified you that he accepted the recommendation that Cameron be allowed to return to school March 30th, right?
A. Correct.
Q. Do you know what, if anything, Dr. Nelson did to make this decision?
A. I do not know.
Q. Cameron was allowed to return to school March 3th, 2023, right?
A. Correct.
Q. And while he was out of school, was Cameron able to complete work on an online platform?
A. Eventually.
Q. What do you mean?
A. The first week they had his laptop and, again, I was not aware that he could have been doing school work. And I read it, actually, in the manual, the handbook, school handbook. So then I reached out to them that Thursday and asked how he's

supposed to do school work when he doesn't have a laptop. And so, then that Friday evening they sent a loaner laptop home with our other son from school. So, he didn't -- wasn't allowed -- or wasn't able to do school work until that Friday evening and he missed the whole first week.

Q. Got it. So the week -- so it sounds like Thursday was the 9th, so you reached out then and the loaner laptop was sent home the next day?

A. The next night, yeah, after school.

Q. Got it. But after that, Cameron was able to complete work?

A. Correct.

Q. And he received credit for all of that work, right?

A. Yes.

Q. Okay. Can you explain to me what your understanding of North Tech is?

A. It's a technical school where they can do -- do trades, learn trades.

Q. What sort of trades?

A. Like, carpentry, electric.

Q. And is it a two year, four year?

A. It's just with the school. So they would go to school, like, half a day and then go to the tech

way, I just want to make sure, is there any other way that this changed your plans, North Tech specifically, that you feel that that changed yours and Cameron's plans for Cameron?
A. That's the main thing.
Q. Okay.
A. His life after.
Q. Got it. Why do you believe that the district suspended Cameron for ten days?
A. They suspended him writing on the walls.
Q. The threats?
A. Yes.
Q. Are you aware of any other students while Cameron was at Pattonville who were accused of making terroristic threats or threatening to shoot up the school?
A. I don't know who they are, but there was tons of them, including the week that he was suspended.
Q. And you said you don't know who any of the students were?
A. I don't know their names, no.
Q. Do you know male, female, any race or anything?
A. I do not know.

Q. And what do you recall about these other instances that you heard about?
A. The only thing that I know specifically was that the week before it was in the girl's bathroom written on a mirror. And that when I asked Cameron what was going on, he just assumed it was -- or had heard it was the same thing that had happened, he didn't know.
Q. Got it. Do you believe that the district treated Cameron differently then it treated other students by suspending him for ten days?
A. I don't know what they did with the other students.
Q. So you're not sure?
A. Correct.
Q. So you couldn't say, and I know this is a little repetitive, but you couldn't say one way or another if you think that his treatment was different than what they would have done with another student?
A. Correct.
Q. Got it.
A. I just know that they didn't handle it -- I don't feel like they handled it properly with him. I don't know what they did with everybody else.

Q. He couldn't recall either, I was seeing if you would know. Okay.

A. I -- I know I sent an e-mail to the school asking them to remind his teachers what they're there to do and not to form opinions and gossip about him. I might have mentioned her name in that e-mail, but.

Q. Got it. Do you believe that the district treated Cameron differently because of his race?

A. I don't know specifically.

Q. Do you believe that students of different races were treated less harshly than Cameron?

A. About, like, the situation or?

Q. If, like, they were in a similar situation do you believe that they were treated less harshly?

A. I don't know. Because I don't know who the other --

MS. SANGMOR: Objection.

Q. (By Ms. McConnell) And like I said, you can answer, if you know.

A. Yeah, I don't know. I don't know who the other students were or anything of that nature.

Q. Do you believe, in general, that Pattonville disciplined white students more harshly than students of other races?

A. I don't know about any discipline that they do with any other kids.

Q. Okay. And do you think that non white students got more opportunities to contest allegations against them, like, in a disciplinary situation?

A. The only thing I can say about the whole race thing, period, is just hearsay and comments from other students and not just his friends. We have, obviously, with five kids that all played sports, we know a lot of people and have -- know a lot of kids. And, you know, we just had heard that they, you know, showed favoritism, but I don't have any specific examples, so I don't won't be able to answer any of the specific examples.

Q. Got it. I was going to ask if they provided you any examples that you recall?

A. Yeah, I don't recall now because at the time I never thought I'd have to use it.

Q. Sure. Do you think that the district treated Cameron differently because he's a male?

A. I mean, I don't know when you say differently, because I -- I don't have anything to compare it to because -- as far as discipline, because I don't know how the other kid was

disciplined.
Q. Got it. And I think I probably know the answer to these, but I want to cover all my bases.
A. Sure.
Q. So do you believe that any female student was treated less harshly than Cameron?
A. I don't know.
Q. Okay. Do you believe that Pattonville disciplined male students more harshly than females?
A. I don't know.
Q. And do you believe that female students got more opportunities to contest allegations against them, like, in disciplinary situations?
A. I don't know.
Q. Okay. Any other reasons why you might think that Cameron was treated more harshly because he is white or a male that we have not discussed?
A. No.
Q. Okay. So, Cameron was criminally charged for making a terroristic threat, right?
A. Correct.
Q. But that charge was, ultimately, dropped, right?
A. Correct.
Q. And I know this is not the easiest question,

was, during his suspension, you know, he didn't have his laptop the first week and then when he did get it, he didn't have a teacher to teach him anything or some of the teachers wouldn't let him -- I don't know if they didn't let him make up or wouldn't help him because they were already past it or something like that. Like, he had to have it all turned up -- he had to have it all turned in by the time he went back to school, I believe. And so, he didn't know to do some of it and so -- and they wouldn't, like, help him and let him turn it in late once he got back.

Q. Got it.

A. And.

Q. Go ahead.

A. And they won't take it off his record, obviously, so that's a thing also. I requested it, but they said no.

Q. Any other ways that you can think of academically?

A. I don't believe so, that we've not discussed.

Q. Okay. Cameron graduated on time in 2025 in May, right?

A. Correct.